IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| BRANDON COREY LASSITER, | * | |
| Plaintiff, | * | |
| v. | * | Civil Action No. JRR-22-2062 |
| WARDEN D. DARDEN, *et al.*, | * | |
| Defendants. | * | |
| | *** | |

## MEMORANDUM OPINION

Self-represented Plaintiff Brandon Corey Lassiter, an inmate presently incarcerated at Dorsey Run Correctional Facility in Jessup, Maryland, filed this civil rights action pursuant to 42 U.S.C. § 1983 against Defendants Sara Johnson, RN, Alysia Keene, RN, and Stephanie Cyran, NP (collectively, the "Medical Defendants"); as well as Defendants Warden Debora Darden, Assistant Warden William Bailey, Security Chief John Milligan, Lieutenant Patricia Gattis, Sergeant Daniela Wade, and Correctional Officer II Charity Cropper[1] (collectively, the "Correctional Defendants").[2]  ECF No. 1.

Lassiter alleges that while he was housed at Eastern Correctional Institution ("ECI") in Westover, Maryland, the Correctional Defendants failed to protect him from being assaulted by other inmates; Sgt. Wade and Officer Cropper failed to follow ECI policies and procedures; and Warden Darden, Assistant Warden Bailey, Security Chief Milligan, and Lt. Gattis failed to properly train their staff. *Id.* at 6.  Lassiter also asserts that the Medical Defendants neglected to

---

[1] The Clerk shall amend the docket to reflect the full and correct names of Defendants.

[2] Lassiter also lists ECI as a Defendant in the body of his Complaint.  ECF No. 1 at 7.  ECI, however, is not a "person" subject to suit under 42 U.S.C. § 1983.  *See Smith v. Montgomery Cnty. Corr. Facility*, Civil Action No. PWG-13-3177, 2014 WL 4094963, at *3 (D. Md. Aug. 18, 2014) (holding that the Montgomery County Correctional Facility "is an inanimate object that cannot act under color of state law and therefore is not a 'person' subject to suit under Section 1983"); *accord Preval v. Reno*, 57 F.Supp.2d 307, 310 (E.D. Va. 1999); *Brooks v. Pembroke City Jail*, 722 F.Supp. 1294, 1301 (E.D. N.C. 1989).  Thus, Lassiter's claims against ECI cannot proceed.

give him proper aid and treatment despite several requests.  *Id.* at 7.  He seeks monetary damages.[3]  *Id.* at 8.

On October 31, 2022, the Medical Defendants filed a Motion to Dismiss or Alternatively for Summary Judgment.  ECF No. 13.  The Court received Lassiter's response in opposition to the Medical Defendants' Motion, as well as a Cross-Motion for Summary Judgment, on December 8, 2022 (ECF Nos. 23, 24), to which the Medical Defendants replied on December 22, 2022 (ECF No. 25).  On January 31, 2023, the Correctional Defendants filed a Motion to Dismiss or for Summary Judgment (ECF No. 28), which Lassiter opposed on February 8, 2023 (ECF No. 32).  In opposing the Motion, Lassiter submitted a declaration pursuant to Federal Rule of Civil Procedure 56(d), asserting that discovery is necessary.  ECF No. 32-1.  The Correctional Defendants replied on March 17, 2023.  ECF No. 41.

Having reviewed the submitted materials, the Court finds that no hearing is necessary.  *See* Local Rule 105.6 (D. Md. 2023).  For the reasons set forth below, by separate order issued herewith, Defendants' Motions, construed as motions for summary judgment, are granted, and Lassiter's Cross-Motion is denied.

## Background

### A. Plaintiff's Allegations

Lassiter alleges that at about 8:30 p.m. on July 16, 2022, he was in the recreation hall at ECI when he noticed a commotion at the back of the tier.  Compl., ECF No. 1 at 2-3.  A "10-10 code" was called and officers responded.  *Id.* at 3.  As Lassiter moved to get a better view, he saw officers escorting an inmate whom he recognized as the "shot caller" of the "Crips gang."  *Id.*  That

---

[3] Lassiter also sought transfer from ECI.  ECF No. 1 at 8.  As he has since been transferred to another facility, this request is moot.  *See United States v. Hardy*, 545 F. 3d 280, 283 (4th Cir. 2008) (explaining that a case is deemed moot "when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome") (quoting *Powell v. McCormack*, 395 U.S. 486, 496 (1969)).

inmate yelled at other Crips to "roll out all those bitch ass Muslims." *Id.* Nonetheless, the officers in the vicinity of the incident did nothing. *Id.* at 4.

Lassiter states that he previously expressed concern to Lt. Gattis about being housed in the same unit as gang-affiliated inmates, but omits to state whether he identified any reason for his concern or implicit request to be moved. ECF No. 1 at 3. Lassiter alleges that, as a Muslim, he began to fear for his safety. *Id.* at 4. Subsequently, "a member of the Crip gang stab[ed] someone in the neck and shoulder area." *Id.* Still, Officer Cropper and other staff members "just watched." *Id.* Members of the gang then began making their way upstairs, where Lassiter and others were located. *Id.* One gang member showed Lassiter a weapon, threatening him. *Id.* In response, Lassiter picked up a chair and placed it between him and the gang members, hoping that officers would soon intervene. *Id.* Next, another inmate "jump kick[ed]" the chair into Lassiter's already-injured knee.[4] *Id.* at 5. Correctional officers did nothing while more gang members gained access to the upper floor. *Id.* A punch was thrown, hitting the inmate beside Lassiter. *Id.*

Thereafter, pepper spray was deployed, and inmates dispersed. *Id.* At that time, Lassiter discovered that he had been stabbed after another inmate pointed it out to him. *Id.* Lassiter changed his clothes, attempted to stop the bleeding, and went to his cell. *Id.* Moments later, Sgt. Wade convinced Lassiter to move to another part of the facility. *Id.* Lassiter agreed, but he was given an infraction, and he was sent to segregation. *Id.*

At about 9:30 p.m., Lassiter was taken to the medical unit to be evaluated. *Id.* at 6. When the nurse asked if he was injured, Lassiter complained about his knee, which had been causing him extreme pain. *Id.* In response, the nurse instructed him to raise this issue at his next chronic care appointment, which, at the time he filed his Complaint, had not yet taken place. *Id.*

---

[4] Lassiter filed a separate Complaint regarding his ongoing knee pain at *Lassiter v. ECI, et al.*, Civil Action No. GLR-22-2013 (D. Md.).

On July 21, 2022, Lassiter saw Defendant Johnson, at which time he complained about his knee and requested a tetanus shot "because [he] was stabbed with a dirty shank." *Id.* Johnson told Lassiter that a medical provider would have to approve the tetanus shot. *Id.* Lassiter saw Johnson multiple times thereafter and he raised the same complaints, but they were always ignored. *Id.*

Lassiter submitted a grievance through ECI's administrative remedy procedure ("ARP"), but he did not receive a response. *Id.* at 2.

### B. Correctional Defendants' Response

According to the Correctional Defendants, Officer Cropper was assigned to Housing Unit 6 D Tier when a 10-10 was called via the in-house radio at approximately 8:34 p.m. Decl. of Cropper, ECF No. 28-3 at ¶1. VICON surveillance footage shows an inmate striking another inmate in a downward motion several times to his left temple at approximately 8:34:30 a.m. *Id.* at ¶2; *see also* DVD Exhibit, ECF No. 28-6. The inmate under assault then pushes his assailant with closed fists and starts to run. *Id.* The victim is eventually handcuffed, escorted to medical, and placed on administrative segregation pending adjustment. *Id.* at ¶3.

The surveillance footage also shows Lassiter, who was upstairs, moving closer to the tier stairs at approximately 8:34:50 a.m. while the alleged gang members make their way up. ECF No. 28-6; *see also* Inmate Hearing Record, ECF No. 28-7 at 4. At around 8:35:00 a.m., an officer enters the dayroom, deploys pepper spray at around 8:35:15 a.m., and exits. *Id.* At around 8:35:30 a.m., Lassiter and other inmates throw punches. *Id.* The Correctional Defendants note that Lassiter went toward the incident when he "could have retreated back to the dayroom." Inmate Hearing Record, ECF No. 28-7 at 4. He is the second person to throw a fist during the altercation, claiming that he went to the stairs in an attempt to prevent 20 people from coming up and causing "a massacre." *Id.* By 8:35:35 a.m., inmates disperse while covering their faces, presumably due to

the effects of the pepper spray. ECF No. 28-6. Some inmates head for the shower; others, including Lassiter, go toward the windows. *Id.* Inmates begin exiting the dayroom around 8:42 a.m., with Lassiter being one of the last to exit at around 8:51 a.m. *Id.*

At approximately 9:38 p.m., Lassiter informed Sgt. Wade that he would refuse housing due to his concern for his safety as a Muslim on the tier. Decl. of Wade, ECF No. 28-4 at ¶2. He was handcuffed and escorted to the medical unit, *id.* at ¶3, then placed on administrative segregation pending adjustment. Traffic History, ECF No. 28-5 at 1.

### C. Medical Defendants' Response

The Medical Defendants state that on July 16, 2022, Lassiter saw Van Warrington, RN before he was placed in administrative segregation. Med. Records, ECF No. 13-3 at 61-63. At that time, Lassiter denied pain, injury, suicidal ideation, and homicidal ideation. *Id.* at 63.

Two days later, Lassiter submitted a sick call request stating that he had not been seen by chronic care since early in the year and his knee was hurting. *Id.* at 41. He submitted another sick call request on July 20, 2022, stating that he needed more Tylenol and Lubriderm/Lubrisoft lotion. *Id.* at 40.

On July 21, 2022, Defendant Johnson saw Lassiter in response to his two sick call requests. *Id.* at 27-28. He complained of right knee pain stemming from an injury in 2020 and stated that he reinjured it when he was "'jumped on' last Saturday." *Id.* Lassiter stated that he "refused care at the time but now it hurts." *Id.* He also requested a tetanus injection due to the injury to his right shoulder, presumably from being stabbed. *Id.* Johnson examined Lassiter's knee and saw no swelling but noted that it was tender to touch. *Id.* Finding no record of a prior tetanus injection in Lassiter's medical chart, Johnson contacted the Infectious Disease nurse to inquire about the request. *Id.*

As a registered nurse, Johnson cannot order a tetanus shot; it must be ordered by a provider. Decl. of Johnson, ECF No. 13-2 at ¶10. Nevertheless, because a tetanus vaccine is ineffective 48 hours after injury and Lassiter did not request it until five days after he was injured, no provider ordered a tetanus shot. *Id.*

Lassiter submitted sick call requests on July 29, August 3, and August 6, 2022, regarding knee pain and a tetanus shot. ECF No. 13-3 at 42-44, 52. On August 12, 2022, he saw Jennifer Adrion, RN for a sick call, at which time he reported right knee pain at a level 10/10 and stated that Tylenol was ineffective. *Id.* at 29-30. On examination, Lassiter's knee was tender and painful with movement. *Id.* Adrion continued his medication and scheduled him with a provider. *Id.*

On September 8, 2022, Lassiter saw Physician's Assistant Bruce Ford for chronic care. *Id.* at 65-69. Lassiter reported right knee and right shoulder pain. *Id.* at 65. Thus, Ford ordered x-rays of the right shoulder and planned to follow-up with results. *Id.*

On September 24, 2022, Lassiter saw Johnson in sick call again with complaints of right knee pain. *Id.* at 70-71. Lassiter reported that Tylenol and muscle rub were ineffective, and he asked to renew his bottom bunk assignment. *Id.* Johnson searched the records but did not find documentation regarding a bottom bunk. *Id.*

On October 5, 2022, Lassiter saw Marie Desir, RN for a sick call for complaints regarding a bottom bunk, lotion, and knee support. *Id.* at 19-20. Desir found no evidence of requests for bottom bunk, lotion, or knee support in the chart. *Id.* Therefore, she indicated that those issues could be addressed during an upcoming scheduled visit with a provider. *Id.* On October 11, 2022, Lassiter saw Desir again for a sick call, at which time she reassured him that x-rays were ordered and a follow-up with a provider would be scheduled as soon as the x-ray results were received. *Id.* at 21.

Defendant Keene, the Assistant Director of Nursing for the West Compound and Annex at ECI, oversees medical staff by ensuring there are enough nurses to cover the floor. Decl. of Keene, ECF No. 13-4 at ¶¶ 2, 5. Because her role is largely administrative, she is only involved in the direct care of a patient is if a nurse reports a problem or there is a shortage of nurses on the floor. *Id.* at ¶5. Keene states she was never made aware that Lassiter's medical needs were not being met. *Id.* Defendant Cyran, a certified registered nurse practitioner, states that the only time she was involved in Lassiter's medical care was when she refilled Lassiter's medications on June 11, 2022, prior to the incidents giving rise to his claims here. Decl. of Cyran, ECF No. 13-5 at ¶5.

**Standard of Review**

**A.     Motion to Dismiss or, Alternatively, for Summary Judgment**

Defendants' Motions are styled as motions to dismiss under FED. R. CIV. P. 12(b)(6) or, in the alternative, for summary judgment under FED. R. CIV. P. 56. A motion styled in this manner implicates the court's discretion under Rule 12(d) of the Federal Rules of Civil Procedure. *Kensington Vol. Fire Dept., Inc. v. Montgomery County*, 788 F. Supp. 2d 431, 436-37 (D. Md. 2011). Ordinarily, a court "is not to consider matters outside the pleadings or resolve factual disputes when ruling on a motion to dismiss." *Bosiger v. U.S. Airways*, 510 F.3d 442, 450 (4th Cir. 2007). Under Rule 12(b)(6), however, a court may exercise its discretion to consider matters outside of the pleadings. If the court does so, "the motion must be treated as one for summary judgment under Rule 56," but "[a]ll parties must be given a reasonable opportunity to present all the material that is pertinent to the motion." FED. R. CIV. P. 12(d); *see also Adams Housing, LLC v. The City of Salisbury, Maryland*, 672 F. App'x 220, 222 (4th Cir. Nov. 29, 2016) (*per curiam*). When a movant requests summary judgment "in the alternative" to dismissal and submits matters outside the pleadings for the court's consideration, the parties are deemed to be on notice that

conversion under Rule 12(d) may occur; the court "does not have an obligation to notify parties of the obvious." *Laughlin v. Metro. Wash. Airports Auth.*, 149 F.3d 253, 261 (4th Cir. 1998).

In contrast, a court may not convert a motion to dismiss to one for summary judgment *sua sponte*, unless it gives 12(d) notice to the parties that it will do so. *Laughlin*, 149 F.3d at 261 (stating that a district court "clearly has an obligation to notify parties regarding any court-instituted changes" in the posture of a motion, including conversion under Rule 12(d)); *Finley Lines Joint Protective Bd. Unit 200 v. Norfolk So. Corp.*, 109 F.3d 993, 997 (4th Cir. 1997) ("[A] Rule 12(b)(6) motion to dismiss supported by extraneous materials cannot be regarded as one for summary judgment until the district court acts to convert the motion by indicating that it will not exclude from its consideration of the motion the supporting extraneous materials."); *see also Adams Housing, LLC*, 672 F. App'x at 622 ("The court must give notice to ensure that the party is aware that it must 'come forward with all of [its] evidence.'") (citation omitted).

A district judge has "complete discretion to determine whether or not to accept the submission of any material beyond the pleadings that is offered in conjunction with a Rule 12(b)(6) motion and rely on it, thereby converting the motion, or to reject it or simply not consider it." 5 C WRIGHT & MILLER, FEDERAL PRACTICE & PROCEDURE § 1366 at 159 (3d ed. 2004, 2011 Supp.). This discretion "should be exercised with great caution and attention to the parties' procedural rights." *Id*. at 149. In general, courts are guided by whether consideration of extraneous material "is likely to facilitate the disposition of the action" and "whether discovery prior to the utilization of the summary judgment procedure" is necessary. *Id*. at 165, 167.

**B.     Discovery**

Ordinarily, summary judgment is inappropriate "where the parties have not had an opportunity for reasonable discovery." *E.I. du Pont De Nemours and Co. v. Kolon Industries, Inc.*,

637 F.3d 435, 448-49 (4th Cir. 2012); *see Putney v. Likin*, 656 F. App'x 632, 638-39 (4th Cir. July 14, 2016) (*per curiam*); *McCray v. Maryland Dep't of Transportation*, 741 F.3d 480, 483 (4th Cir. 2015). However, "the party opposing summary judgment 'cannot complain that summary judgment was granted without discovery unless that party has made an attempt to oppose the motion on the grounds that more time was needed for discovery.'" *Harrods Ltd. v. Sixty Internet Domain Names*, 302 F.3d 214, 244 (4th Cir. 2002) (quoting *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 961 (4th Cir. 1996)). To raise adequately the issue that discovery is needed, the non-movant typically must file an affidavit or declaration pursuant to Rule 56(d) (formerly Rule 56(f)), explaining why, "for specified reasons, it cannot present facts essential to justify its opposition," without needed discovery. FED. R. CIV. P. 56(d); *see Harrods*, 302 F.3d at 244-45 (discussing affidavit requirement of former Rule 56(f)).

"[T]o justify a denial of summary judgment on the grounds that additional discovery is necessary, the facts identified in a Rule 56 affidavit must be 'essential to [the] opposition.'" *Scott v. Nuvell Fin. Servs., LLC*, 789 F. Supp. 2d 637, 641 (D. Md. 2011) (alteration in original) (citation omitted). A non-moving party's Rule 56(d) request for additional discovery is properly denied "where the additional evidence sought for discovery would not have by itself created a genuine issue of material fact sufficient to defeat summary judgment." *Strag v. Bd. of Trs., Craven Cmty. Coll.*, 55 F.3d 943, 954 (4th Cir. 1995); *see Amirmokri v. Abraham*, 437 F. Supp. 2d 414, 420 (D. Md. 2006), *aff'd*, 266 F. App'x. 274 (4th Cir.), *cert. denied*, 555 U.S. 885 (2008).

If a non-moving party believes that further discovery is necessary before consideration of summary judgment, the party fails to file a Rule 56(d) affidavit at his peril, because "'the failure to file an affidavit . . . is itself sufficient grounds to reject a claim that the opportunity for discovery was inadequate.'" *Harrods*, 302 F.3d at 244 (citations omitted). But, the non-moving party's

9

failure to file a Rule 56(d) affidavit cannot obligate a court to issue a summary judgment ruling that is obviously premature. Although the Fourth Circuit has placed "'great weight'" on the Rule 56(d) affidavit and has said that a mere "'reference to Rule 56(f) [now Rule 56(d)] and the need for additional discovery in a memorandum of law in opposition to a motion for summary judgment is not an adequate substitute for [an] affidavit,'" the appellate court has "not always insisted" on a Rule 56(d) affidavit. *Id*. (internal citations omitted).

Failure to file an affidavit may be excused "if the nonmoving party has adequately informed the district court that the motion is premature and that more discovery is necessary," and the "nonmoving party's objections before the district court 'served as the functional equivalent of an affidavit.'" *Harrods*, 302 F.3d at 244-45 (internal citations omitted); *see also Putney*, 656 F. App'x at 638; *Nader v. Blair*, 549 F.3d 953, 961 (4th Cir. 2008). Moreover, "[t]his is especially true where, as here, the non-moving party is proceeding pro se." *Putney*, 656 F. App'x at 638.

Here, Lassiter has not requested discovery as to the Medical Defendants. As to the Correctional Defendants, he has filed a declaration pursuant to Rule 56(d) asserting that discovery is necessary to determine: (1) the ECI staff's knowledge of the events that took place on July 16, 2021; (2) whether there are policies regarding these types of incidents and whether officers complied with them; (3) correctional officers' knowledge of surveillance camera locations and de-escalation tactics; (4) the number of inmates that suffered stab wounds; and (5) whether Lassiter expressed the effect that the incident had on him. ECF No. 32-1 at 3.

Upon review of Lassiter's request, the Court concludes that discovery is not necessary to enable him to oppose the Correctional Defendants' Motion. As discussed below, even if Lassiter were to receive the requested information, he would nonetheless fail to establish a meritorious §

1983 claim. The Court will therefore construe Defendants' Motions as ones for summary judgment.

**C.      Summary Judgment**

Summary judgment is governed by FED. R. CIV. P. 56(a), which provides in part: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The Supreme Court has clarified that this does not mean that any factual dispute will defeat the motion. "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original).

"The party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 525 (4th Cir. 2003) (alteration in original) (quoting Fed. R. Civ. P. 56(e)), *cert. denied*, 541 U.S. 1042 (2004). The court should "view the evidence in the light most favorable to . . . the nonmovant, and draw all inferences in her favor without weighing the evidence or assessing the witnesses' credibility." *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 644-45 (4th Cir. 2002); *see FDIC v. Cashion*, 720 F.3d 169, 173 (4th Cir. 2013).

The district court's "function" is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. Moreover, the trial court may not make credibility determinations on summary judgment. *Jacobs v. N.C. Administrative Office of the Courts*, 780 F.3d 562, 569 (4th Cir. 2015); *Mercantile*

*Peninsula Bank v. French*, 499 F.3d 345, 352 (4th Cir. 2007); *Black & Decker Corp. v. United States*, 436 F.3d 431, 442 (4th Cir. 2006); *Dennis*, 290 F.3d at 644-45.  Therefore, in the face of conflicting evidence, such as competing affidavits, summary judgment is generally not appropriate, because it is the function of the factfinder to resolve factual disputes, including matters of witness credibility.

Nevertheless, to defeat summary judgment, conflicting evidence, if any, must give rise to a *genuine* dispute of material fact.  *See Anderson*, 477 U.S. at 247-48.  If "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," then a dispute of material fact precludes summary judgment.  *Id*. at 248; *see Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013).  On the other hand, summary judgment is appropriate if the evidence "is so one-sided that one party must prevail as a matter of law."  *Id*. at 252.  Similarly, "the mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff."  *Id*.

Because plaintiff is self-represented, his submissions are liberally construed.  *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007).  But, the court must also abide the "'affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial.'" *Bouchat*, 346 F.3d at 526 (internal quotation marks omitted) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778–79 (4th Cir. 1993), and citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986)).

**Discussion**

**I.     Correctional Defendants**

In his Complaint, Lassiter claims that the Correctional Defendants failed to protect him from being assaulted by other inmates; Sgt. Wade and Officer Cropper failed to follow ECI policies

and procedures; and Warden Darden, Assistant Warden Bailey, Security Chief Milligan, and Lt. Gattis failed to properly train their staff. ECF No. 1 at 6.

Section 1983 imposes civil liability on a person who, under color of state law, deprives any citizen of the United States or other person under the jurisdiction thereof of any right secured by the Constitution or laws of the United States. It "is not an independent source of substantive rights, but simply a vehicle for vindicating preexisting constitutional and statutory rights." *Safar v. Tingle*, 859 F.3d 241, 245 (4th Cir. 2017) (citing *Graham v. Connor*, 490 U.S. 386, 393-94, (1989)). "For a claim based on a failure to prevent harm, a person must show that he is being detained, or incarcerated 'under conditions posing a substantial risk of serious harm.'" *See Brown v. Harris*, 240 F.3d 383, 389 (4th Cir. 2001) (quoting *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)). Objectively, the prisoner "must establish a serious deprivation of his rights in the form of a serious or significant physical or emotional injury" or substantial risk of either injury. *Danser v. Stansberry*, 772 F.3d 340, 346-47 (4th Cir. 2014). The objective inquiry requires this Court to "assess whether society considers the risk that the prisoner complains of to be so grave that it violates contemporary standards of decency to expose *anyone* unwillingly to such a risk." *Helling v. McKinney*, 509 U.S. 25, 36 (1993). A genuine dispute of fact regarding the extent of the injury suffered precludes summary judgment. *Raynor v. Pugh*, 817 F.3d 123, 128 (4th Cir. 2016).

Next, a plaintiff must establish that the prison official involved had "a sufficiently culpable state of mind," which, in this context, "is one of deliberate indifference to inmate health or safety." *Farmer*, 511 U.S. at 834 (internal quotation marks and citations omitted). This subjective inquiry requires evidence that the official had actual knowledge of an excessive risk to the prisoner's safety— "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists; and he must also draw the inference." *Id*. at 837. A plaintiff

may "prove an official's actual knowledge of a substantial risk 'in the usual ways including inference from circumstantial evidence,'" and "'a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious.'" *Raynor*, 817 F.3d at 128 (quoting *Farmer*, 511 U.S. at 842).

Actual knowledge of a substantial risk does not alone impose liability. "[A] prison official cannot be found liable under the Eighth Amendment for failing to protect an inmate unless the official knows of an excessive risk of danger to inmate health and safety, and the official knowingly and deliberately acts, or fails to act, in a manner that uniquely increases the risk." *Hopkins v. Maryland*, WMN-99-2216, 2000 WL 1670991, at *3 (D. Md. Sept. 26, 2000) (citing *Farmer*, 511 U.S. at 837; *Rich v. Bruce*, 129 F.3d 336, 338-340 (4th Cir. 1997)). However, where prison officials responded reasonably to a risk, they may be found free of liability. *Farmer*, 511 U.S. at 844.

Here, it is undisputed that Lassiter was injured during the incident on July 16, 2022. However, even if the Court finds that, objectively, he suffered a significant physical injury, Lassiter has neither established that, nor generated a dispute of fact as to whether, the Correctional Defendants were deliberately indifferent to his safety. Further, construed broadly, Lassiter does not suggest that discovery would enable him to create a dispute of fact on this point. There is nothing in the undisputed record to suggest or demonstrate that the Correctional Defendants had actual knowledge, prior to the incident, that Lassiter's assailant posed a danger or risk of harm to him. Lassiter's sole allegation is that he previously informed Lt. Gattis that he did not want to be housed near gang-affiliated inmates as a general proposition. Nothing in the record suggests or demonstrates that Lassiter gave a specific reason for his assertion (construed as a request to be moved) or otherwise indicated that he was exposed to a heightened risk of harm, or that he believed

he was, based on any particular condition or status. There is no evidence that he named or identified his enemies. Indeed, Lassiter refused to name his enemies as recently as February 2023, while seeking transfer to another institution. *See* ECF No. 41 at 4 (citing ECF No. 32 at 7).

Moreover, as a matter of law, the Correctional Defendants cannot be liable under the Eighth Amendment for failure to protect Lassiter because they responded objectively reasonably to the incident. Lassiter alleges that correctional officers merely watched while he and another inmate were stabbed, but based on the undisputed surveillance video, only approximately 30 seconds elapsed from the time the first inmate was stabbed (8:34:30 a.m.) and the time a correctional officer entered the dayroom to deploy pepper spray (8:35:00 a.m.). ECF No. 28-6. Although Lassiter became involved in an altercation (8:35:30 a.m.) shortly after the officer exited the dayroom (8:35:15 a.m.), all of the inmates dispersed 10 seconds later (8:35:40 a.m.), thus stopping any other attacks. *Id.*

Even if Lassiter received additional information regarding the Correctional Defendants' knowledge of the incident, surveillance cameras, relevant policies, and de-escalation tactics, as requested in his Rule 56(d) declaration, none of it would assist Lassiter in establishing subjective intent on the part of the correctional officers; neither would receipt of information regarding the incident's effect on Lassiter and other inmates. As nothing in the record provides any foundation upon which a court or jury could reasonably conclude that any of the Correctional Defendants had actual knowledge of a risk of harm to Lassiter, and they acted reasonably in response to his injury, they could not, as a matter of law, have been deliberately indifferent to Lassiter. Accordingly, the Correctional Defendants are entitled to summary judgment in their favor on the failure to protect claim.

To the extent Lassiter claims that Sgt. Wade and Officer Cropper violated ECI policies while responding to the incident, such a claim does not rise to a constitutional violation. The adoption of procedural guidelines does not give rise to a liberty interest; thus, failure to follow regulations does not, in itself, violate Lassiter's due process rights. *See Culbert v. Young*, 834 F.2d 624, 628 (7th Cir. 1987); *accord Kitchen v. Ickes*, 116 F. Supp. 3d 613, 629 (D. Md. 2015), *aff'd*, 644 F. App'x 243 (4th Cir. 2016).

Lastly, Lassiter alleges that Warden Darden, Assistant Warden Bailey, Security Chief Milligan, and Lt. Gattis failed to properly train their staff to respond to security incidents such as this. However, liability under § 1983 attaches only upon personal participation by a defendant in the constitutional violation. It is well established that the doctrine of respondeat superior does not apply in § 1983 claims. *See, e.g., Love-Lane v. Martin*, 355 F.3d 766, 782 (4th Cir. 2004) (no respondeat superior liability under § 1983); *see also Trulock v. Freeh*, 275 F.3d 391, 402 (4th Cir. 2001) (same). Liability of supervisory officials "is not based on ordinary principles of respondeat superior, but rather is premised on 'a recognition that supervisory indifference or tacit authorization of subordinates' misconduct may be a causative factor in the constitutional injuries they inflict on those committed to their care.'" *Baynard v. Malone*, 268 F.3d 228, 235 (4th Cir. 2001) (quoting *Slakan v. Porter*, 737 F.2d 368, 372 (4th Cir. 1984)). Supervisory liability under § 1983 must be supported by allegation(s) that: (1) the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to citizens like the plaintiff; (2) the supervisor's response to the knowledge was so inadequate as to show deliberate indifference to, or tacit authorization of, the alleged offensive practices; and (3) an affirmative causal link between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff. *Shaw v. Stroud*, 13 F.3d 791, 799

(4th Cir. 1994). None of these features is present here. Thus, Warden Darden, Assistant Warden Bailey, Security Chief Milligan, and Lt. Gattis are entitled to summary judgment on this ground as well.

## II.     Medical Defendants

Lassiter asserts that the Medical Defendants neglected to give him proper aid and treatment despite his several requests for same. Indeed, the Eighth Amendment prohibits "unnecessary and wanton infliction of pain" by virtue of its guarantee against cruel and unusual punishment. *Gregg v. Georgia*, 428 U.S. 153, 173 (1976); *see also Hope v. Pelzer*, 536 U.S. 730, 737 (2002); *Scinto v. Stansberry*, 841 F.3d 219, 225 (4th Cir. 2016); *King v. Rubenstein*, 825 F.3d 206, 218 (4th Cir. 2016). "Scrutiny under the Eighth Amendment is not limited to those punishments authorized by statute and imposed by a criminal judgment." *De'Lonta v. Angelone*, 330 F.3d 630, 633 (4th Cir. 2003) (citing *Wilson v. Seiter*, 501 U.S. 294, 297 (1991)); *accord Anderson v. Kingsley*, 877 F.3d 539, 543 (4th Cir. 2017). To state an Eighth Amendment claim for denial of medical care, a plaintiff must demonstrate that the actions of the defendants, or their failure to act, amounted to deliberate indifference to a serious medical need. *See Estelle v. Gamble*, 429 U.S. 97, 106 (1976); *see also Anderson*, 877 F.3d at 543.

Deliberate indifference to a serious medical need requires proof that, objectively, the prisoner plaintiff was suffering from a serious medical need and that, subjectively, the prison staff were aware of the need for medical attention but failed either to provide it or ensure it was available. *See Farmer*, 511 U.S. at 834-37 (1994); *see also Heyer v. U.S. Bureau of Prisons*, 849 F.3d 202, 209-10 (4th Cir. 2017); *King*, 825 F.3d at 218; *Iko v. Shreve*, 535 F.3d 225, 241 (4th Cir. 2008). Further, the medical condition at issue must be objectively serious. *See Hudson v. McMillian,* 503 U.S. 1, 9 (1992) (providing that there is no expectation that prisoners will be

provided with unqualified access to health care); *Jackson v. Lightsey*, 775 F.3d 170, 178 (4th Cir. 2014). Proof of an objectively serious medical condition, however, does not end the inquiry.

The subjective component requires "subjective recklessness" in the face of the serious medical condition. *See Farmer*, 511 U.S. at 839, 840; *see also Anderson*, 877 F.3d at 544. Under this standard, "the prison official must have both 'subjectively recognized a substantial risk of harm' and 'subjectively recognized that his[/her] actions were inappropriate in light of that risk.'" *Anderson*, 877 F.3d at 545 (quoting *Parrish ex rel. Lee v. Cleveland*, 372 F.3d 294, 303 (4th Cir. 2004)); *see also Rich v. Bruce*, 129 F.3d 336, 340 n.2 (4th Cir. 1997) ("True subjective recklessness requires knowledge both of the general risk, and also that the conduct is inappropriate in light of that risk."). "Actual knowledge or awareness on the part of the alleged inflictor . . . becomes essential to proof of deliberate indifference 'because prison officials who lacked knowledge of a risk cannot be said to have inflicted punishment.'" *Brice v. Va. Beach Corr. Ctr.*, 58 F.3d 101, 105 (4th Cir. 1995) (quoting *Farmer*, 511 U.S. at 844). The subjective knowledge requirement can be met through direct evidence of actual knowledge or through circumstantial evidence tending to establish such knowledge, including evidence "that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Scinto*, 841 F.3d at 226 (quoting *Farmer*, 511 U.S. at 842). If the requisite subjective knowledge is established, an official may avoid liability "if [he] responded reasonably to the risk, even if the harm ultimately was not averted." *Farmer*, 511 U.S. at 844; *see also Cox v. Quinn*, 828 F.3d 227, 236 (4th Cir. 2016) ("[A] prison official's response to a known threat to inmate safety must be reasonable."). Reasonableness of the actions taken must be judged in light of the risk the defendant actually knew of at the time. *See Brown*, 240 F.3d at 390.

As the plaintiff in this matter, Lassiter must provide some evidence that, at a minimum, that he suffered from a serious medical condition that was either recognized by medical staff as serious or was obvious to anyone who observed him at the time. *See Scinto*, 841 F.3d at 226 (subjective prong may be established by proof of actual knowledge or circumstantial evidence tending to establish actual knowledge). Here, after Lassiter was stabbed and struck with a chair, he was taken to the medical unit to be evaluated. During that visit, he was seen by Nurse Warrington, who noted that Lassiter denied pain, injury, suicidal ideation, and homicidal ideation.

Lassiter did not see any of the Medical Defendants until five days after he was injured, when he met with Johnson during a sick call visit. At that time, Lassiter admitted that he refused care on the night of the incident. He complained of right knee pain and requested a tetanus injection due to the injury to his right shoulder. In response, Johnson examined Lassiter's knee and contacted the Infectious Disease nurse to inquire about the tetanus shot.

On this record, there is no basis on which a court or jury could reasonably conclude that Johnson demonstrated deliberate indifference to Lassiter's medical needs; and Lassiter does not suggest discovery would cure this deficiency. Because Johnson, as a registered nurse, could not order the tetanus shot herself, she responded appropriately by inquiring about the matter. Ultimately, Lassiter did not receive the shot because it is effective only if received within 48 hours of the initial injury. As it is undisputed that Lassiter declined care on the night he was stabbed, resulting injury cannot be attributed to the Medical Defendants. Further, there is no evidence that Cyran or Keene had any involvement in Lassiter's care regarding this matter. As such, the Medical Defendants are entitled to summary judgment in their favor on Lassiter's deliberate indifference claim.

## Conclusion

For the foregoing reasons, Defendants' Motions, construed as motions for summary judgment, are granted. Lassiter's Cross-Motion for Summary Judgment is denied.

A separate Order follows.

/S/

August 16, 2023
Date

‎ ‎ ‎ ‎ ‎ ‎ ‎ ‎ ‎ ‎ ‎ ‎ ‎ ‎ ‎ ‎ ‎ ‎ ‎ ‎ ‎ ‎ ‎ ‎ ‎ ‎ ‎ ‎ ‎ ‎ ‎ ‎ ‎ ‎ ‎ ‎ ‎ ‎ ‎ ‎ ‎ ‎ ‎ ‎ ‎ ‎ ‎ ‎ ‎ ‎ ‎ ‎ ‎ Julie R. Rubin
United States District Judge